IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| VICKI B. KLAASEN, | ) | CIVIL NO. 17-00315 HG-KSC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| NANCY A. BERRYHILL, Acting | ) | |
| Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ORDER AFFIRMING THE DECISION OF THE SOCIAL SECURITY
ADMINISTRATION COMMISSIONER**

This case involves the appeal of the Social Security
Administration Commissioner's denial of Disability Insurance
Benefits to Plaintiff Vicki B. Klaasen.

On January 30, 2013, Plaintiff filed an application for
Disability Insurance Benefits pursuant to Title II of the Social
Security Act. Plaintiff claims that she has been disabled since
September 12, 2010, because of conditions affecting her
shoulders, back, and left hip.

The Social Security Administration denied her application.
Following an administrative hearing, the Administrative Law Judge
("ALJ") held that Plaintiff was not disabled for a continuous
period of at least 12 months following her onset disability date
of September 12, 2010 through December 31, 2014, the date she was
last insured. The Appeals Council denied Plaintiff's request for
review of the ALJ's decision and Plaintiff appealed to this
Court.

The Court **AFFIRMS** the decision of the Social Security Administration Commissioner.

## PROCEDURAL HISTORY

On January 30, 2013, Plaintiff Vicki B. Klaasen filed an application for Disability Insurance Benefits with the Social Security Administration. (Administrative Record ("AR") at pp. 12, 223-28, ECF No. 9).

On November 21, 2013, the Social Security Administration denied Plaintiff's initial application. (AR at pp. 91-101).

On May 13, 2014, the Administration denied her request for reconsideration. (AR at pp. 103-15).

Following the denial of Plaintiff's request for reconsideration, she sought a hearing before an Administrative Law Judge ("ALJ"). (AR at p. 125).

On November 17, 2015, an ALJ conducted a hearing on Plaintiff's application. (AR at pp. 38-89).

On January 7, 2016, the ALJ issued a written decision denying Plaintiff's application. (AR at pp. 12-22).

Plaintiff sought review by the Appeals Council for the Social Security Administration. The Appeals Council denied further review of Plaintiff's application on June 19, 2017, rendering the ALJ's decision as the final administrative decision by the Commissioner of Social Security. (AR at pp. 1-8).

On July 5, 2017, Plaintiff sought judicial review of the Commissioner of Social Security's final decision to deny her

application for Disability Benefits in this Court pursuant to 42 U.S.C. § 405(g). (Complaint for Review of Social Security Disability Insurance Determination, ECF No. 1).

On October 11, 2017, the Magistrate Judge issued a briefing schedule. (ECF No. 10).

On December 11, 2017, Plaintiff filed PLAINTIFF'S OPENING BRIEF. (ECF No. 11).

On February 7, 2018, the Defendant filed DEFENDANT'S ANSWERING BRIEF. (ECF No. 12).

On March 12, 2018, Plaintiff filed PLAINTIFF'S REPLY BRIEF. (ECF No. 13).

On April 9, 2018, the Court held a hearing on Plaintiff's appeal of the decision of the Social Security Administration Commissioner.

## BACKGROUND

**Plaintiff's Work History**

Plaintiff is a 61 year-old female. (Administrative Record ("AR") at p. 20, ECF No. 9).

From June 1996 to September 2007, Plaintiff worked as a Territory and Project Manager in construction projects in Alaska. (Id. at pp. 100-01, 243). Plaintiff testified that she went through a training program with Exxon Mobile and worked in various places throughout Alaska. (Id. at p. 48).

Plaintiff's most recent employment occurred in 2010. (Id. at pp. 41-42). Plaintiff worked for six months as a Mechanical

Inspector on an Army Base in Alaska.  (Id. at pp. 43-44).
Plaintiff inspected the mechanical systems in the construction
project, mostly HVAC and air systems including hydrostatic
testing.  (Id. at pp. 44-46).  Plaintiff explained that the
position required her to be out in the field.  (Id. at pp. 47-
48).  Plaintiff's inspection duties of the construction sites
required her to climb ladders, crawl under ducts, and manually
inspect that the installation of materials matched the blueprints
and specifications.  (Id. at pp. 45-48).

Following her employment as a Mechanical Inspector,
Plaintiff worked for sixty days as a Project Manager for a
construction project.  (Id. at pp. 41-42)  Plaintiff explained
that her duties were to keep the construction project on
schedule, inspect the work, and manage subcontractors.  (Id.)

Plaintiff stated that she stopped working at her last
position because she was on probation for sixty days and the
employer terminated her employment following the probationary
period.  (Id. at p. 52).  Plaintiff testified that she had not
worked in nearly five years.  (Id. at p. 54).  She testified that
she suffered from pain in her shoulders and hip that made it
difficult to work.  (Id. at pp. 54-57).  Plaintiff also testified
that she has back pain, numbness in her legs, and has trouble
sleeping.  (Id.)

**Plaintiff's Medical History**

In 2001, Plaintiff had an arthroscopic repair of her right

4

hip labrum.  (AR at p. 382, ECF No. 9).  In 2002, Plaintiff had an arthroscopic repair of her right shoulder labrum.  (Id.)

Seven years later, in April 2009, Plaintiff was diagnosed with degenerative joint disease in her right shoulder.  (Id. at p. 355).  Plaintiff was treated with steroid injections in her right shoulder to allow her to travel on a European vacation without pain.  (Id.)

Plaintiff did not seek follow-up treatment until January 29, 2013, the day before she first applied for Social Security Disability Benefits.  Her first follow-up treatment was nearly four years since her last doctor's appointment and almost three years after she stopped working in 2010.  (Id. at p. 382).

At her follow-up appointments, Plaintiff reported shoulder, hip, and back pain to her treating physicians from January 2013 through December 2014. (Id. at pp. 360-413, 431).

In March 2015, Plaintiff consulted a physician in Hawaii for her ongoing pain and numbness complaints because she was living part-time in Alaska and part-time in Hawaii.  (Id. at p. 415). The physician found some evidence of joint disease and pinched nerves in Plaintiff's spine.  (Id.)

Plaintiff's physicians recommended shoulder replacement but Plaintiff declined surgery.  (Id. at pp. 381-84, 411, 431).

**The Social Security Administration's Review of Plaintiff's January 2013 Application For Disability Benefits**

Plaintiff's January 30, 2013 application for Social Security

Administration Disability Insurance Benefits was initially denied on November 21, 2013. (AR at p. 12, ECF No. 9).

Following the initial denial, Plaintiff moved for reconsideration. (Id. at p. 121). On May 14, 2014, the Social Security Administration denied Plaintiff's motion for reconsideration. (Id. at pp. 103-15). On July 22, 2014, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Id. at pp. 125-26).

On November 17, 2015, a hearing on Plaintiff's application for Social Security Administration Disability Benefits was held before an ALJ. (Id. at pp. 38-89). The ALJ denied Plaintiff's application for Disability Insurance Benefits. (Id. at pp. 12-22).

Plaintiff claimed that she was disabled for a continuous period following September 12, 2010, due to degenerative joint disease to her right and left shoulders; degenerative lumbar disc disease; and degenerative joint disease to her left hip. (Id. at p. 14).

The ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. (AR at p. 15, ECF No. 9).

The ALJ determined that Plaintiff's medical impairments could reasonably be expected to cause her alleged symptoms of shoulder, back, and leg pain, but her statements concerning the

intensity, persistence, and limiting effects of the symptoms was not credible.  (Id. at pp. 16-20).

The ALJ agreed with Plaintiff that she was not capable of performing her past relevant work as a Project Manager and Mechanical Inspector but was not precluded from working at all. (Id. at p. 20).

The Administrative Law Judge determined that Plaintiff was classified as "advanced age" at the time of the hearing based on the Social Security Administration regulations, 20 C.F.R. § 404.1563.  (AR at p. 20, ECF No. 9).  The ALJ determined that Plaintiff acquired work skills from her past relevant work and found that the work skills were transferable to other occupations with jobs existing in significant numbers in the national economy.  (Id. at p. 21).

The ALJ found that there was work that existed in significant numbers in the economy that Plaintiff could perform. (Id. at pp. 21-22).  The Administrative Law Judge relied on the testimony of a vocational expert to find that someone with Plaintiff's residual functional capacity could perform work as a Material Lister.  (Id. at p. 21).

 Plaintiff sought review of the Administrative Law Judge's decision with the Appeals Council.  The Appeals Council declined Plaintiff's request for review and rendered the ALJ's decision as the final administrative decision by the Commissioner of Social Security.  (Id. at pp. 1-3).

**STANDARD OF REVIEW**

A claimant is disabled under the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); see 42 U.S.C. § 1382c(a)(3)(A); Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

A decision by the Commissioner of Social Security must be affirmed by the District Court if it is based on proper legal standards and the findings are supported by substantial evidence on the record as a whole.  See 42 U.S.C. § 405(g); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971); see also Tylitzki v. Shalala, 999 F.2d 1411, 1413 (9th Cir. 1993).

**ANALYSIS**

**I.  Plaintiff's Work History Prior to Her Alleged On-Set Date of Disability on September 12, 2010**

From June 1996 to September 2007, Plaintiff worked as a Territory and Project Manager in construction projects in Alaska. (AR at pp. 100-01, 243, ECF No. 9).  Plaintiff went through a

training program with Exxon Mobile and worked on different construction projects throughout Alaska. (Id. at p. 48).

Plaintiff testified that she was most recently employed by Johnson Controls as a Project Manager for sixty days in 2010. (Id. at pp. 41-42). Plaintiff did not know the exact dates of her employment, but testified she worked on a probationary period after which she was terminated. (Id. at pp. 41, 50). Plaintiff explained that she had pain in her shoulders, back, and legs when she worked at Johnson Controls but it did not prevent her from working and it was not the reason for her termination. (Id. at pp. 50-52). Plaintiff stated that after the sixty-day probationary period the company "fired" her. (Id. at p. 52).

Plaintiff explained that before Johnson Controls she worked for six months as a Mechanical Inspector on an Army base in Alaska. (Id. at p. 45). Plaintiff described her job duties as follows:

> So we're building a facility for an F-16 fighter plane and there are a couple of construction trailers. One of them has the management folks in them. The construction trailer I was in had the inspectors. There was a electrical inspector, mechanical inspector which was me and a guy who did all the structural architectural stuff.
>
> As they build this project, you have to go out and inspect your piece that you're responsible for. For instance, if they're putting ductwork in, you have to go make sure that the ductwork is the right size. That the ductwork is in the right place. That it matches the plans and specifications. When they're doing the wet work, you have to go out and make sure that all the stuff is run where it's supposed to be run.
>
> (Id.)

Plaintiff explained that the position had lifting and carrying requirements and she was on-site at the construction project. (Id. at pp. 47-48). Plaintiff explained that the physical requirements of the job were too demanding, and she could not move the ladders to climb and crawl around the ductwork. (Id. at p. 47).

## II. Plaintiff's Medical Evaluations Following Her Alleged On-Set Disability Date Of September 12, 2010

Plaintiff did not seek medical treatment from her alleged on-set date of disability of September 12, 2010 until nearly two and a half years later, on January 29, 2013, the day before she applied for Social Security Disability Benefits. (AR at p. 382, ECF No. 9).

### A. Evaluation by Dr. Charles Soma in January 2013

On January 29, 2013, Plaintiff was treated by Dr. Charles Soma, M.D., in Hawaii. (Id.) Dr. Soma's records indicate that Plaintiff's prior medical history included an arthroscopic right hip labrum repair in 2001 and an arthroscopic right shoulder labrum tear in 2002. (Id.)

Dr. Soma performed a magnetic resonance imaging ("MRI") scan of Plaintiff's right and left shoulders. (Id. at p. 382). Imaging revealed mild degenerative joint disease in the right shoulder with mild joint effusion in the left shoulder. (Id. at pp. 402-05). Dr. Soma found mild limitation in Plaintiff's left

shoulder with good grip and motor skills.  (Id. at p. 382)  He found degeneration in her right shoulder joint and recommended shoulder replacement or physical therapy.  (Id. at pp. 382-384).

Dr. Soma issued a prescription for Plaintiff to attend physical therapy for two days a week, for six weeks, for a total of 12 sessions.  (Id. at pp. 395-96).

Plaintiff attended a total of 4 physical therapy sessions with Physical Therapist Lee Poston from March 7, 2013 to April 3, 2013.  There is no indication that she completed the prescribed physical therapy.  (Id. at pp. 398, 400).

### B.   Evaluation by Dr. Elizabeth Ignacio in May 2013

Plaintiff's treating physician, Dr. Soma, referred Plaintiff to imaging specialist Dr. Elizabeth Ignacio, M.D., to have imaging conducted of Plaintiff's hips.  On May 3, 2013, Dr. Ignacio interpreted the scans of Plaintiff's pelvis and left hip oblique.  (Id. at p. 407).  Plaintiff was found to have a well-aligned pelvis and femurs with "very mild degenerative change bilaterally" in the hips.  (Id.)

### C.   Evaluation by Dr. Nalani Gauen in October 2013

On October 29, 2013, Plaintiff was evaluated by Dr. Nalani Gauen, M.D., for an orthopaedic consultation.  (Id. at p. 360). Dr. Gauen found that Plaintiff had normal posture and stance, no difficulty rising on her toes and heels, and had a normal gait. (Id. at p. 363).  The examination revealed limitations in

11

Plaintiff's range of motion for her right shoulder but no evidence of swelling or deformity.  (Id.)  Plaintiff had normal range of motion in her legs and moderate limitation in the range of motion in her hips.  (Id.)  Dr. Gauen found Plaintiff had 40-45 pounds of grip strength with normal strength by muscle testing in all muscle groups of the upper and lower extremities, rating 5 out of 5.  (Id. at p. 364).

Dr. Gauen concluded that Plaintiff had severely impaired range of motion in her right shoulder with pain, right hip pain, and some lower back pain with degeneration.  (Id. at p. 365).

### D.    Evaluation By Dr. Jeffrey Chester in October and November 2013

On October 9, 2013, Dr. Jeffrey Chester, D.O., conducted nerve and muscle testing of Plaintiff's lower extremities and found evidence that she suffered from a pinched nerve in her cervical spine.  (Id. at p. 373).

On November 4, 2013, Dr. Chester conducted nerve and muscle testing of Plaintiff's upper extremities and found no abnormalities.  (Id. at p. 368).

### E.    State-Agency Medical Opinions in November 2013 and May 2014

On November 21, 2013, Dr. G. Harp, M.D., reviewed Plaintiff's medical records on behalf of the agency.  Dr. Harp found the Plaintiff partially credible.  (Id. at pp. 91-102). Dr. Harp found that the objective medical evidence supported a

finding that Plaintiff could perform light work with some postural, manipulative, and environmental limits as of January 29, 2013.  (Id. at p. 96).

On May 13, 2014, Dr. N. Shibuya, M.D. reviewed Plaintiff's medical records on behalf of the agency on a request for reconsideration from the Plaintiff.  (Id. at pp. 103-13).  Dr. Shibuya concluded that Plaintiff was only partially credible and found some of her statements inconsistent with the objective medical evidence in the record.  (Id. at p. 110).  Dr. Harp found that Dr. Gauen's report was only entitled to partial weight given inconsistencies between his conclusions and the objective findings.  (Id.)

## F. Evaluations by Dr. Robert Hall in August and December 2014

On August 8, 2014, Plaintiff was evaluated by Dr. Robert Hall, M.D., her primary physician in Alaska.  (Id. at p. 410).  Dr. Hall found that Plaintiff could move her right shoulder forward about 120 degrees and abduction about 120 degrees without pain.  (Id.)  Dr. Hall determined that movement past 120 degrees was possible with limited pain.  (Id.)

On December 29, 2014, Plaintiff was again evaluated by Dr. Hall.  (Id. at p. 431).  Plaintiff's chief complaint was for right leg pain.  Dr. Hall noted that Plaintiff had been traveling back and forth between Alaska and Hawaii.  (Id.)  Dr. Hall recommended a lumbar epidural for her leg pain but was unable to

complete the treatment because Plaintiff was traveling back to Hawaii. (Id.) Just as Dr. Charles Soma had recommended on January 29, 2013, Dr. Hall recommended a shoulder replacement for Plaintiff's right shoulder pain. Dr. Hall noted that Plaintiff "is not interested" in replacement. (Id.)

**G.   Evaluation by Dr. Chester in March 2015**

On March 26, 2015, sixteen months after her last evaluation by Dr. Chester, Plaintiff was again evaluated for hip and shoulder pain. (Id. at p. 415). Dr. Chester's notes stated that he spent the majority of the appointment providing education and counseling to Plaintiff. Dr. Chester's notes state:

> >50% of the 25 minute face to face time was dedicated to patient **and husband** education/counseling. Patient and husband education/counseling topics included: current conditions, review of diagnostic test results, treatment options besides medications, standard of care pain management in general, need for PCP [primary care provider] service outside of this office for all medical issues not addressed at this office, self care management and follow up.

(Id. at p. 417).

Dr. Chester recommended conservative treatment with medication and indicated that "Patient left office in no apparent distress and in satisfactory condition." (Id.)

**H.   Evaluation by Occupational Therapist John DeCarlo in May 2015**

On May 5, 2015, Plaintiff had a functional capacity evaluation by Occupational Therapist John DeCarlo, M.S.O.T. (Id.

at pp. 420-28, 442). Mr. DeCarlo found that Plaintiff was limited to sedentary work that requires minimal computer input and that she was limited to sitting up to 45 minutes at a time and standing for 20 minutes at a time. (Id.)

## I. Physician Medical Source Statement by Dr. Hall in May 2015

On May 27, 2015, Dr. Hall completed a Physician Medical Source Statement regarding Plaintiff. (Id. at pp. 438-41). Dr. Hall found a number of limitations, finding that Plaintiff could walk one city block, she could sit for 45 minutes at a time, she could stand for 12-20 minutes at a time, she could occasionally lift 10 pounds, she could occasionally climb stairs, and she could reach overhead 50% of the time with her left upper extremity. (Id.)

## III. Applicable Law

The Social Security Administration has implemented regulations establishing when a person is disabled so as to be entitled to benefits under the Social Security Act, 20 C.F.R. § 404.1520; 42 U.S.C. § 423. The regulations establish a five-step sequential evaluation process to determine if a claimant is disabled. The Commissioner of the Social Security Administration reviews a disability benefits claim by evaluating the following:

(1)   Has the claimant been engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.

15

(2)  Has the claimant's alleged impairment been
     sufficiently severe to limit his ability to work?
     If not, the claimant is not disabled.  If so,
     proceed to step three.

(3)  Does the claimant's impairment, or combination of
     impairments, meet or equal an impairment listed in
     20 C.F.R. Part 404, Subpart P, Appendix 1?  If so,
     the claimant is disabled.  If not, proceed to step
     four.

(4)  Does the claimant possess the residual functional
     capacity to perform his past relevant work?  If
     so, the claimant is not disabled.  If not, proceed
     to step five.

(5)  Does the claimant's residual functional capacity,
     when considered with the claimant's age,
     education, and work experience, allow him to
     adjust to other work that exists in significant
     numbers in the national economy?  If so, the
     claimant is not disabled.  If not, the claimant is
     disabled.

Stout v. Comm'r Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th

Cir. 2006) (citing 20 C.F.R. § 404.1520).

The claimant has the burden of proof at steps one through

four, and the Commissioner has the burden of proof at step five.

Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001).


IV.  **The Administrative Law Judge Reviewed Plaintiff's
     Application By Using The Five-Step Sequential Evaluation**


At Plaintiff's November 17, 2015 administrative hearing, the

Administrative Law Judge ("ALJ") for the Social Security

Administration reviewed Plaintiff's claim by engaging in the

five-step sequential evaluation.

The Parties agree there were no errors in the first three

steps of the administrative review process.

At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity since the alleged disability date of September 12, 2010.  (AR at p. 14, ECF No. 9).

At step two, the ALJ found that Plaintiff has the following severe impairments: degenerative joint disease to the right and left shoulders; degenerative lumbar disc disease; degenerative joint disease to the left hip.  (Id.)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. § 404.1520(d), 404.1525, and 404.1526.  (AR at p. 15, ECF No. 9).

The Parties disagree as to the ALJ's evaluations at steps four and five in the administrative review process.

At step four, the ALJ reviewed the record and made a finding as to Plaintiff's residual functional capacity.  The ALJ found that Plaintiff could not perform her past work.  He found:

> [T]he claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except she could occasionally, defined as no more than one-third of a workday, lift and carry 10 pounds; she could occasionally bend, stoop, squat, crouch, or crawl; she was limited to four hours of sitting in an eight-hour workday; she could stand or walk for four hours in an eight-hour workday; she could sit for up to 45 minutes at a time; she could stand or walk for 20 minutes at a time; she was limited to minimal, defined as 15% of the time, reaching above shoulder level with both shoulders.

(AR at p. 15, ECF No. 9).

At step five, the ALJ asked the Vocational Expert to

evaluate if Plaintiff, a person of advanced age, acquired work skills from past relevant work. (Id. at p. 21). The Vocational Expert testified that Plaintiff had acquired skills of supervising, reviewing blueprints, scheduling, and familiarity with parts and materials. (Id.) The Vocational Expert stated that Plaintiff's transferrable skills would allow for direct entry into skilled sedentary work. (Id.)

The ALJ found that someone with Plaintiff's limitations could perform work as a Material Lister. (Id.) The Vocational Expert testified that there were 40,000 positions for this job in the United States. (Id.)

Plaintiff's appeal challenges the ALJ's findings, raising three arguments.

First, Plaintiff argues that the ALJ did not establish that Plaintiff could work as a Material Lister without any vocational adjustment.

Second, Plaintiff asserts that the ALJ erred in relying on the Vocational Expert's testimony as to the number of Material Lister positions available.

Third, Plaintiff argues that the ALJ erred by rejecting parts of the opinions of treating physicians Dr. Hall, Dr. Gauen, and occupational therapist Mr. DeCarlo. Plaintiff claims that their opinions should have been entitled to more weight and that the ALJ erred by instead accepting the overall opinions of treating physicians Dr. Soma and Dr. Chester and non-treating physicians Dr. Harp and Dr. Shibuya.

18

**V.    The ALJ Properly Denied Plaintiff's Application For Disability Benefits**

**A.    The ALJ Made A Finding That No Vocational Adjustment Was Necessary For Plaintiff To Perform Skilled Sedentary Work**

Plaintiff contends that the ALJ failed to identify the degree of vocational adjustment required for Plaintiff to work in a skilled sedentary position.

At step five of the five-step sequential process, the ALJ must determine if the claimant is able to do any other work considering her residual functional capacity, age, education, and work experience.  20 C.F.R. § 404.1520(g)(1).  In making this determination, the ALJ relies on the Dictionary of Occupational Titles as well as testimony of vocational experts who testify about specific occupations that a claimant can perform based on their residual functional capacity.  Zavalin v. Colvin, 778 F.3d 842, 845-46 (9th Cir. 2015).

In cases involving individuals 55 years of age or older, who are unable to perform their past work, the ALJ must make a specific finding as to the amount of vocational adjustment required for the claimant to transfer to a new position.  20 C.F.R. § 404.1568(d)(4); Coletta v. Massanari, 163 F.Supp.2d 1101, 1105 (N.D. Cal. 2001) (citing Renner v. Heckler, 786 F.2d 1421, 1425 (9th Cir. 1986)).

A claimant's skills are transferable when the skilled work the claimant did in the past can be used to meet the requirements of other jobs.  Renner, 786 F.2d at 1423.  In order to find

transferability of skills to skilled sedentary work for individuals who are of advanced age, there must be very little, if any, vocational adjustment required in terms of tools, work processes, work settings, or industry.  20 C.F.R. pt 404, Subpt P, App. 2, § 200.00(f); <u>Bray v. Comm'r of Soc. Sec. Admin.</u>, 554 F.3d 1219, 1225 (9th Cir. 2009); <u>see</u> SSR 82-41, 1982 WL 31389, *7;  <u>Frost v. Berryhill</u>, 2018 WL 1509197, *6 (D. Or. Mar. 27, 2018)).

Here, the ALJ made a specific finding that Plaintiff acquired transferable skills from her past work.  (AR at p. 21, ECF No. 9).  The Vocational Expert classified Plaintiff's past work as a Job Superintendent and stated that Plaintiff gained skills of supervising, reviewing blueprints, scheduling, and familiarity with parts and materials.  (<u>Id.</u>)

The ALJ made a specific finding that no vocational adjustment was necessary for the Plaintiff because her transferable skills "would allow for direct entry into skilled sedentary work."  (<u>Id.</u>)  At the hearing the ALJ questioned the Vocational Expert, as follows:

> ALJ: Now shortly after the alleged onset date, the Claimant attains the age of 55.  Okay.  All right.  All right.  And at that point in time, we must consider whether or not the Claimant possesses transferable skills that would allow for **direct entry** to skilled or semiskilled light or sedentary work.  Does she possess those transferable skills?
>
> VE:  Yes, Your Honor.
>
> ALJ: Okay.  Okay.  One more second.  And can you first identify what transferable skills that she can utilize for **direct entry** to skilled light or sedentary work,

and then secondly, can you identify the jobs
themselves?

VE: Yes, Your Honor.  The Claimant starting with the
industry in which she work, she was also a supervisor
if you will.  She also is familiar with blueprints.
She also is familiar with scheduling and she is also
familiar with various parts and materials.

ALJ: Okay.  And utilizing those transferable skills, what
jobs can she **directly** entry – enter that are skilled,
light or sedentary work?

VE: Yes, Your Honor.  In [Dictionary of Occupational
Titles], she could be a material lister.  This is
regarded as a sedentary position, a [specific
vocational position] of 5, with a [Dictionary of
Occupational Titles] of code of 229.387-010.

(Id. at pp. 77-78) (emphasis added).

The ALJ's Written Decision found that Plaintiff could
perform the duties of a Material Lister without vocational
training because her transferable skills allowed for direct entry
into skilled sedentary work.  (Id. at p. 21).  The ALJ confirmed
that the Vocational Expert's testimony was consistent with the
information contained in the Dictionary of Occupational Titles.
(Id.)

The ALJ properly considered Plaintiff's age and found that
she was able to perform work as a Material Lister without
vocational adjustment.

## B.  The ALJ Properly Relied On The Testimony Of The Vocational Expert Concerning The Number Of Jobs Available

Plaintiff asserts that the ALJ erred by failing to make
certain inquiries of the Vocational Expert about the number of

available jobs that someone with Plaintiff's limitations could perform. Plaintiff claims that her Attorney asked questions about other sources of information with different numbers than those provided by the Vocational Expert and argues that the ALJ should have made findings concerning the disagreement.

The burden of establishing that there exists other work in "significant numbers" lies with the Commissioner of Social Security. <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1099 (9th Cir. 1999).

According to the Social Security Act, an individual shall be determined to be under a disability if he is unable to do his previous work and cannot engage:

> in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The AJL did ask the Vocational Expert about the number of positions available for someone with Plaintiff's limitations and relied on the Vocational Expert's testimony that there are approximately 40,000 Material Lister positions in the national economy. (AR at p. 21, ECF No. 9).

The Ninth Circuit Court of Appeals has "never set out a bright-line rule" for what constitutes a significant number of jobs but it has found that more than 25,000 jobs nationally

constitutes a significant number.  Gutierrez v. Comm'r of Soc.
Sec., 740 F.3d 519, 528-29 (9th Cir. 2014).

The regulations explain that work does not constitute a
significant number when there are only "isolated jobs that exist
only in very limited numbers in relatively few locations outside
of the region where [a claimant] live[s]."  20 C.F.R. §
404.1566(b).

The ALJ's reliance on the testimony of the Vocational Expert
as to the number of relevant jobs in the national economy was
warranted.  Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir.
2005) (finding that an ALJ may rely on a vocational expert's
testimony regarding the number of relevant jobs in the national
economy and explaining that a vocational expert's "recognized
expertise provides the necessary foundation for his or her
testimony").  The ALJ's finding that more than 40,000 positions
were available for Plaintiff in the national economy does not
fall into the category of "isolated jobs" existing in "very
limited numbers."  20 C.F.R. § 404.1566(b).  The ALJ's finding
based on the testimony of the Vocational Expert that 40,000
positions exist in the national economy satisfies the
requirements of 42 U.S.C. § 423(d)(2)(A).

Plaintiff's Attorney claims that she believes the number of
jobs in the national economy is lower than what was testified to
by the Vocational Expert.  Contrary to Plaintiff's position, a
vocational expert's testimony may, without more, constitute
substantial evidence of the number of jobs that exist in the

national economy.  <u>Bayliss</u>, 427 F.3d at 1218.  The ALJ did not err in relying on the Vocational Expert's testimony.

The Ninth Circuit Court of Appeals recently addressed the issue relating to a vocational expert's testimony as to the number of jobs available.  In <u>Buck v. Berryhill</u>, 869 F.3d 1040, 1047, 1051-52 (9th Cir. 2017), the Ninth Circuit Court of Appeals remanded proceedings after the ALJ cut off an attorney's questioning of the vocational expert regarding the job numbers available and the ALJ failed to consider evidence in the record as to the number of jobs available.

In this case, the ALJ allowed for a thorough examination of the Vocational Expert by the Plaintiff's Attorney and allowed her to submit a post-hearing memorandum.  (AR at pp. 83-89, ECF No. 9).  The Vocational Expert explained his job calculations based on his expertise, the job descriptions provided in the Dictionary of Occupational Titles and the Occupational Outlook Handbook, and estimates provided by the Bureau of Labor Statistics.  (AR at pp. 82-84, ECF No. 9).  Plaintiff's Attorney told the Vocational Expert that she found only 3,000 Material Lister positions on a program called SkillTran.  The Vocational Expert explained that those job numbers were estimates and that his calculations were based on a larger compilation of information including numbers from the Bureau of Labor Statistics.  (<u>Id.</u>)  The ALJ properly relied on the Vocational Expert's overall expertise and full assessment from various sources rather than the Attorney's understanding of his calculations and her focus on one source's

estimate.

An ALJ must clarify discrepancies in the record only where there is an apparent unresolved conflict that arises between the vocational expert's testimony and the Dictionary of Occupational Titles. Dewey v. Colvin, 650 Fed. Appx. 512, 514 (9th Cir. 2016); Mickelson-Wurm v. Comm'r Soc. Sec. Admin., 285 Fed. Appx. 482, 486 (9th Cir. 2008). There was no conflict between the Vocational Expert's testimony and the Dictionary of Occupational Titles because the Dictionary of Occupational Titles does not provide the number of positions that exist in the national economy.

The ALJ properly relied on the Vocational Expert's testimony as to the number of Material Lister jobs available in the national economy. Bayliss, 427 F.3d at 1218.

**C. The ALJ Did Not Err In Declining To Credit Plaintiff's Testimony As To The Severity Of Her Symptoms And Some Of The Medical Opinions In The Record**

> **1. The ALJ Did Not Err In Finding Plaintiff Not Credible**

An individual's statement as to her pain or other symptoms is not necessarily treated as conclusive evidence of disability. 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529(a).

The claimant must produce objective medical evidence of an underlying impairment or impairments that could reasonably be expected to produce some degree of symptom. Smolen v. Chater, 80 F.3d 1273, 1281-82 (9th Cir. 1996). An ALJ may discredit the

claimant's testimony about the severity of her symptoms by offering specific, clear and convincing reasons for doing so. Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008).

The ALJ's credibility findings must be sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony.  Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002).

Here, the ALJ made specific, clear and convincing findings to discredit Plaintiff's testimony as to the severity of her symptoms and her claimed inability to work.  The ALJ found that Plaintiff's testimony as to the severity of her symptoms was inconsistent with the objective medical evidence in the record. The ALJ also found that Plaintiff's lack of treatment and failure to follow the course of treatment prescribed by her treating physicians, including a refusal to undergo shoulder surgery, undermined her credibility.

### a.   Plaintiff's Failure To Seek Treatment And Failure To Follow Prescribed Course Of Treatment

The ALJ found that Plaintiff's evidence supported limited impairments to her right shoulder, back, and hip, but the ALJ found "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  (AR at p. 16, ECF No. 9).

The ALJ may consider many factors in weighing a claimant's credibility.  The ALJ is correct to look to unexplained or

inadequately explained failure of the claimant to seek treatment or to follow a course of treatment prescribed by her own physician.  Tommasetti, 533 F.3d at 1039.

Plaintiff claims that she was disabled since September 2010. Plaintiff did not seek treatment for years after her alleged on-set date of disability.  Plaintiff did not receive any treatment for her right shoulder between 2009 and January 29, 2013, the day before she first applied for Social Security Disability Benefits. The ALJ found that Plaintiff's "lack of treatment suggests that her impairments were not as limiting as alleged."  (AR at p. 16, ECF No. 9).

Following Plaintiff's January 29, 2013 appointment, Dr. Soma gave Plaintiff a prescription to attend physical therapy for her right shoulder.  (AR at p. 395, ECF No. 9).  Dr. Soma prescribed physical therapy twice a week, for three weeks.  Plaintiff did not follow the prescribed treatment.

On March 1, 2013, Dr. Soma again issued Plaintiff a prescription to attend physical therapy twice a week for three weeks for her right shoulder.  (Id. at p. 396).  Plaintiff attended only four of the prescribed sessions.  (Id. at pp. 398, 400).

On October 15, 2013, Plaintiff was again prescribed physical therapy and was referred to have an orthotic evaluation.  (Id. at pp. 389).  Plaintiff declined to pursue treatment.  (Id.)

Plaintiff's unexplained failure to seek treatment and her refusal to follow her physician's prescribed course of treatment

27

supports the ALJ's credibility determination.  <u>Tommasetti</u>, 533

F.3d at 1039;  <u>Molina v. Astrue</u>, 674 F.3d 1104, 1113-14 (9th Cir.

2012)  <u>Fricke v. Astrue</u>, 2012 WL 2395178, *7 (E.D. Wash. June 25,

2012) (citing <u>Fair v. Bowen</u>, 885 F.2d 597, 603 (9th Cir. 1989)).

### b.    Plaintiff's Refusal to Undergo Shoulder Surgery

The objective medical evidence demonstrates that Plaintiff's

treating physicians recommended shoulder surgery for her right

shoulder, but Plaintiff refused to undergo this treatment that

would alleviate her shoulder impairment.  (AR at pp. 17, 383,

431, 435, ECF No. 9).

On January 29, 2013, Dr. Soma, one of Plaintiff's treating

physicians in Hawaii, recommended right shoulder replacement.  He

stated that "right shoulder pain due to chondrolysis and

arthritic degeneration suggestive that joint replacement would be

helpful to reduce pain to a tolerable level.  HEMI CAP technique

is considered.  Schedule as patient interest dictates to go to

[physical therapy] for improvement of ROM and perhaps elimination

of pain with exercise."  (<u>Id.</u> at p. 383).

On August 8, 2014, Dr. Hall, Plaintiff's treating physician

in Alaska, also recommended shoulder replacement.  Dr. Hall

stated that Plaintiff was evaluated in Hawaii and recognized that

the physicians in Hawaii recommended shoulder replacement but

Plaintiff "does not feel like she would like to have shoulder

replacement at this point.  She is inquiring about whether she

might have any other options." (<u>Id.</u> at p. 410). Dr. Hall completed a physical evaluation and stated, "I discussed with the patient I think at some point, she probably will want the shoulder replacement, but again that would be up to her." (<u>Id.</u> at p. 411).

Four months later, Dr. Hall again recommended that Plaintiff undergo shoulder surgery in order to alleviate her symptoms and pain. Dr. Hall stated, "I discussed with the patient that as far as the shoulder, again the other option she would have surgically would be a shoulder replacement which again she is not interested in at this point." (<u>Id.</u> at p. 431). Dr. Hall discussed other treatment options but they were unavailable to Plaintiff as she chose instead to travel back and forth between Alaska and Hawaii. (<u>Id.</u>)

The ALJ did not err in finding that Plaintiff's lack of treatment supported a finding that Plaintiff was not credible as to the duration and severity of her alleged disability. In situations where a treatment has been shown to be effective but the patient refuses to avail herself of the treatment offered, that fact alone allows a determination that the impairments that could be so treated are not disabling. <u>Blackwell v. Colvin</u>, 2016 WL 4702823, *5 (E.D. Cal. Sept. 7, 2016) (citing <u>Warre v. Commissioner</u>, 439 F.3d 1001, 1006 (9th Cir. 2006)).

The ALJ found that the Plaintiff's credibility regarding the disabling degree of her symptoms was undermined by the objective medical evidence. <u>Garza v. Astrue</u>, 380 Fed. Appx. 672, 673 (9th Cir. 2010) (affirming the ALJ's discrediting of the claimant's testimony as to the severity of her leg pain where the claimant's gait and sensory and motor exams were normal).

The ALJ found Plaintiff's testimony that she had severe neck and back pain not credible. (AR at p. 18, ECF No. 9). An examination by Dr. Chester found no objective evidence to support Plaintiff's claims because her cervical x-rays appeared normal and Plaintiff had normal gait and no difficulties in transfers to and from the examination table. (<u>Id.</u> at pp. 415-18).

The ALJ found Plaintiff not credible regarding the severity of her pain. (<u>Id.</u> at p. 18). The objective medical evidence, specifically the MRI results, "revealed minor abnormalities that would not cause the severity of pain alleged" by Plaintiff. (<u>Id.</u>)

The ALJ found that Plaintiff's complaints of weakness were not credible. (<u>Id.</u>) Plaintiff testified at the hearing that she had such severe pain that at least once a month she could not pick up a coffee cup. (<u>Id.</u> at p. 56). The evaluation by Dr. Gauen in October 2013 directly contradicted Plaintiff's testimony. Dr. Gauen's evaluation revealed that Plaintiff had normal strength by manual muscle testing in all muscle groups of

the upper and lower extremities, graded 5 out of 5, and her grip strength was equally measured with Plaintiff able to grip 40 to 45 pounds at a time.  (Id. at pp. 364-65).

The ALJ properly discounted Plaintiff's credibility by citing the conflicts between her subjective complaints and the objective medical evidence.  Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999).

### 2.    The ALJ Did Not Err In Not Relying On Some Of The Treating Physician's Findings

The ALJ discredited portions of the opinions of Dr. Hall and Dr. Gauen to the extent that their opinions were not based on objective findings but were instead based on Plaintiff's uncredited self-reporting as to the severity of her symptoms. Thomas, 278 F.3d at 957 (finding that the ALJ is not required to accept the opinion of any physician, including a treating physician, if that opinion is not supported by clinical findings); Tommasetti, 533 F.3d at 1041 (finding the ALJ properly rejected a treating physician's opinion regarding the claimant's limitations that "did not mesh with her objective data or history").

The ALJ properly relied on the opinions of treating physicians Dr. Soma and Dr. Chester, the objective medical evidence, and the determinations of the State agency medical doctors, Dr. G. Harp, M.D., and Dr. N. Shibuya, M.D., which were based on objective clinical findings.  Those findings supported

the ALJ's rejection of the inconsistent conclusions asserted by treating physicians. Hensley v. Colvin, 600 Fed. Appx. 526, 527 (9th Cir. 2015). The ALJ may properly discredit a treating physician's conclusions concerning the persistence and severity of Plaintiff's limitations when they conflict with Plaintiff's own testimony. Molina, 674 F.3d at 1112-13 (citing Morgan, 169 F.3d at 600)). In addition, the ALJ properly discredited the opinions that were conclusory, brief, and unsupported by the record as a whole or by objective medical findings. Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).

The ALJ did not err in declining to credit Dr. Gauen's opinion and Dr. Hall's standardized Physical Medical Source Statement to the extent the evaluations were based on Plaintiff's subjective reporting. Dean v. Comm'r of Soc. Sec., 504 Fed. Appx. 563, 565 (9th Cir. 2013) (finding that the ALJ properly rejected the treating doctor's findings because he submitted a standardized form rather than objective medical findings. The doctor appeared to rely primarily on subjective reporting and his findings were inconsistent with those of the State's physicians).

The ALJ provided specific reasons for disagreement with Dr. Gauen's finding that Plaintiff was restricted to two hours of standing and walking. The ALJ explained that "Dr. Gauen's examination revealed a normal gait, and the claimant had no trouble rising on her heels or toes. Also, straight leg raise testing was negative." (AR at p. 18, ECF No. 9). The ALJ properly declined to credit Dr. Gauen's limitation as it

conflicted with other objective medical evidence and was based on Plaintiff's unreliable self-reporting.

The ALJ did not err in declining to credit other limitations found by Dr. Gauen and Dr. Hall to the extent the opinions were inconsistent with the record as a whole. Contrary to Plaintiff's position, the Ninth Circuit Court of Appeals has found that an ALJ is not required to recite "magic words" in order to reject the opinion of a treating physician. Magallanes v. Bowen, 881 F.2d 747, 755 (9th Cir. 1989). A reviewing court is permitted to draw specific and legitimate inferences from the ALJ's opinion. Id.

In addition, the ALJ provided germane reasons for rejecting the opinion of Occupational Therapist John DeCarlo. Molina, 674 F.3d at 1111 (finding that evidence from a medical source other than a physician may be discounted by the ALJ if he "gives reasons germane to each witness for doing so."). The ALJ explained that Mr. DeCarlo's opinion was inconsistent with the overall record and included limitations that were inconsistent with objective evidence including the x-ray and MRI evidence and the testing conducted by Dr. Gauen. (AR at p. 20, ECF No. 9). The ALJ properly relied on the "imaging that shows minor abnormalities, signs of good strength and fair range of motion during Dr. Gauen's impartial evaluation, and signs of good strength and fair range of motion during Dr. Soma's examinations." (Id.)

The Court has reviewed the entire record and finds that

there is substantial evidence to support the ALJ's decision.

**CONCLUSION**

The Commissioner of Social Security Administration's decision is **AFFIRMED**.

The Clerk of Court is Ordered to **CLOSE THE CASE.**

IT IS SO ORDERED.

DATED: April 25, 2018, Honolulu, Hawaii.

Helen Gillmor
United States District Judge